UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:21 CR 5 JAR (ACL) |
| | ) |
| JERRY MICHAEL CONLEY, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). The Defendant, Jerry Conley, is charged with being a previously convicted felon in possession of a firearm. (Doc. 2.) Conley filed a Motion to Suppress Evidence and Statements (Doc. 25) alleging that officers violated his Fourth and Fifth Amendment rights. Specifically, Conley claims that he was unlawfully detained by an officer who was checking on his well-being. He requests suppression of items taken from his person and the stolen vehicle in which he had been seated, as well as his statements. *Id*. The Government opposes the request for suppression. (Doc. 31.)

An evidentiary hearing was held (Doc. 37, Transcript) during which three officers testified, including: Steele Police Department's Chief, Billy Joe Stanfield, Jr.; as well as two officers from the Pemiscot County Sheriff's Department— Captain Michael Coleman and Chris Callen who was assigned as a Task Force Officer (TFO) for the Bureau of Alcohol, Tobacco, Firearms, and Explosives. Chief Stanfield and TFO Callen

were cross-examined by defense counsel.  Following the hearing, the parties filed post-hearing memoranda.  (Docs. 47, 50, and 55.)

In consideration of the testimony and evidence adduced, the undersigned recommends that the following findings of fact and conclusions of law be adopted, and that the Defendant's Motions be denied.

## I.  Proposed Findings of Fact

On June 25, 2020, Chief Stanfield received a call from a concerned citizen who reported that there was a Honda parked on Beasley Road with a subject in the vehicle who appeared to be passed out.  At 8:41 a.m., Chief Stanfield responded to the area and located a Honda Accord that was backed into one of the parking spaces by government housing on Beasley Road.  He parked his patrol vehicle on a slight angle.  The front end of his vehicle was pointed toward the driver's side of the Honda in a manner that the Honda could have pulled out of the parking space to the right without striking the patrol vehicle.

After parking, Chief Stanfield approached the vehicle.  He observed a female asleep in the driver's seat and a male asleep in the front passenger seat.  Chief Stanfield tapped on the driver's side window and both occupants woke up.  The female rolled her window down and Chief Stanfield explained he was there to check on their well-being based on the concerned citizen's call.  Chief Stanfield noticed there was not a license plate on the front bumper of the car.  The State of Missouri requires vehicles to have license plates affixed on the front and back of vehicles.  There was no marking on the

Honda to provide an indication it was registered or licensed in Missouri or any other state.

Chief Stanfield asked the female why they were there. She explained that they were looking for a place to stay. Chief Stanfield replied that "it was government housing, and it wasn't…a motel or hotel." (Doc. 37 at p. 52.) He testified that both occupants of the Honda appeared scared and nervous; that they were trembling or shaking. Chief Stanfield asked if the pair had "anything such as guns and drugs in the car." *Id*. at p. 16. The female answered "no" and the male responded, "there shouldn't be." *Id*.

Next, Chief Stanfield asked the man and woman for their identification. Both replied that they did not have any identification documents. The female said she didn't have a license as it was either revoked or suspended, but she gave her name, date of birth, and social security number. The male provided a last name of C-o-n-n-l-e-y, an incorrect date of birth, and two different social security numbers. Chief Stanfield did not believe the male was being truthful. When the information provided was radioed into the Pemiscot County Dispatcher, no person was found—the man was not on file.

Chief Stanfield asked the female to sit on a cement block adjacent to the rear of the Honda, which she did. At this point, he noticed that in addition to there not being a license plate on the front of the Honda, there was not a license plate on the rear of the car. Chief Stanfield read the Vehicle Identification Number (VIN) from the dash of the vehicle to the Pemiscot County Dispatcher. The Dispatcher indicated the car had been reported stolen from the Nashville, Tennessee area.

In response to that information, Chief Stanfield went to the passenger side of the Honda and told the male to show his hands. He wanted to make sure the scene was secure for safety reasons. The man appeared nervous. As Chief Stanfield began to handcuff the male, the female "stood up and took off running." *Id*. at p. 22. Chief Stanfield was the only officer on the scene and needed to secure the man. He could not chase the woman.

After the man was handcuffed, Chief Stanfield patted him down and found a pill bottle in one of the man's front pants pockets. The prescription label on the bottle was partially removed and Chief Stanfield believed it contained non-prescribed controlled substances. He then moved the man toward the front of the Honda so that he could further examine the car. The man began to complain that his stomach hurt. The man asked to sit down or lie on the ground, and Chief Stanfield told the man he could.

From outside the stolen Honda, Chief Stanfield observed a gun in plain view on the front passenger seat floorboard. He photographed the area where he observed the gun before recovering it. *See* Government Exhibit #7. After calling in the serial number from the gun, the Dispatcher indicated that the gun had also been reported stolen. The gun was a Colt .45 caliber semi-automatic pistol. It was loaded with four rounds of ammunition in the magazine. The gun was seized as evidence.

After the firearm was recovered, Captain Coleman arrived at the scene. Chief Stanfield briefed him on the situation; and they examined the pill bottle. It contained five green balloons that were suspected of containing heroin. Since the Honda was a stolen

vehicle, a tow truck was called to the scene.  A cursory inventory search of the Honda resulted in the discovery of a black plastic box containing syringes.

The man tried talking to Chief Stanfield about the car while at the government housing parking lot.  The man talked about not feeling good, he said that his stomach was hurting.  He also said that he didn't know the car was stolen.  Chief Stanfield responded "'Just wait until we get to the police department.  We'll sit down, and I'll talk to you.'" (Doc. 37 at pp. 63-64.)  Chief Stanfield asked the man if he wanted an ambulance to be called to the scene.  The man replied, "no."  *Id*. at p. 64.  Approximately, thirty minutes after calling the tow truck, the vehicle was towed from the scene.

Chief Stanfield transported the man to the police department for an interview.  After turning the recording equipment on in an interview room, Chief Stanfield asked the man's name.  He answered, "Jerry Michael Conley."  *See* Government Exhibit #8.  Conley also provided his date of birth, then stated he was unable to recite more than the first four numbers of his social security number.  Chief Stanfield read the *Miranda* warning to Conley, who responded that he understood his rights but did not want to make a statement on video.  At 10:11 a.m., Conley indicated he would only answer questions off camera.  The recording equipment was turned off.  Conley signed the "Steele Missouri Police Department *Miranda* Warning" form (Government Exhibit #1) at 10:13 a.m., after which Conley made statements about the stolen Honda and gun.

A more complete inventory of the Honda was conducted the following day.  Mail addressed to the registered owner of the Honda was found in the trunk of the vehicle.  The owner claimed the Honda shortly thereafter.

Also, on June 26, 2020, TFO Callen conducted an interview with Conley. Again, Conley was advised of his rights pursuant to *Miranda*. Conley stated that he understood his rights and waived them. He signed an "Acknowledgment of Rights" form indicating he understood his *Miranda* rights, and waived those rights further indicating he was willing to "make a statement and answer questions." *See* Government Exhibit #2. During this recorded interview (Government Exhibit #9), Conley admitted to knowingly possessing the firearm as a convicted felon but stated he did not know it was stolen.

Conley now requests suppression of the evidence seized on June 25, 2020, as well as the statements he made on June 25 and 26, 2020.

## II.  Discussion

Conley requests that the evidence seized from his person and the stolen Honda be suppressed based on his assertion that there was insufficient probable cause for the scope of the search conducted by Chief Stanfield, and that Stanfield exceeded the scope of his authority when he detained Conley following the wellness check.  (Doc. 25 at p. 2, Doc. 47 at p. 1, and Doc. 55 at p. 1.)  Conley further argues that the way Stanfield parked his patrol car resulted in Conley being unlawfully detained.  (Doc. 47 at pp. 1-2, 4.)

The Government opposed the Defendant's suppression request.  (Docs. 31, 55.)

**II.A.  Was Conley unlawfully seized?**

The ultimate touchstone of the Fourth Amendment is "reasonableness." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).  "Encounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute for crime." *Terry v. Ohio*, 392 U.S. 1, 13 (1968).  "[P]olice officers are not

only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions.'" *Winters v. Adams*, 254 F.3d 758, 763 (8th Cir. 2001) (quoting *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993)).  The "'community caretaking' aspect of local law enforcement" is described "as those activities that are 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). The Eighth Circuit "has recognized, under the 'community caretaker' classification, that noninvestigatory searches and seizures may be justified in certain limited situations." *United States v. Harris*, 747 F.3d 1013, 1017 (8th Cir. 2014) (collecting cases) (*reh'g and reh'g en banc denied*).  As stated in *Harris*:

> A search or seizure of a person by a police officer acting in the officer's noninvestigatory capacity is reasonable if the "governmental interest in the police officer's exercise of [the officer's] 'community caretaking function,'" "'based on specific articulable facts,'" outweighs "'the individual's interest in being free from arbitrary government interference.'"

*Id*. at 1017 (citations omitted).  "The scope of the encounter must be carefully tailored to satisfy the purpose of the initial detention, and the police must allow the person to proceed once the officer has completed the officer's inquiry, unless, of course, the officer obtains further reason to justify the stop." *Id*.

In *Harris*, police responded to a call from a Greyhound bus employee who reported a man was asleep on a bench in the bus station (where guns were prohibited) and the sleeping man had a gun sticking out of his pocket.  The Eighth Circuit concluded the warrantless seizure of the handgun was reasonable under the community caretaker

Page 7 of 14

doctrine. 747 F.3d at 1018-20. First, the *Harris* panel examined whether the officers were acting as community caretakers or to investigate a crime; and then weighed the government's interest in the officers' actions against Harris's right to be free from government intrusion. It further noted that "the governmental interest vindicating the officers' action" was "not encompassed in the enforcement of criminal statutes but, instead, in the officers' obligation '"to help those in danger and to protect property," and to "'ensure the safety of the public and/or the individual, regardless of any suspected criminal activity.'" *Id*. at 1018 (citations omitted). The *Harris* panel then referenced reasoning from the Supreme Court, including "that a police encounter may 'be designed simply to help an intoxicated person find his way home, with no intention of arresting him unless he becomes obsterperous.'" *Id*. (quoting *Terry*, 392 U.S. at 13).

After being satisfied that the initial encounter was justified, the *Harris* panel "assess[ed] whether the scope of the encounter was carefully tailored to satisfy the purpose of the initial detention," by "consider[ing] the protective measures the police took to ensure their safety and the scope and duration of the intrusion." Relevant here is the Eighth Circuit's consideration of reasonableness in the context of lawful traffic stops during which "a police officer may conduct an investigation reasonably related in scope to the circumstances that justified the stop," including "routine tasks such as a check of the vehicle's registration and the driver's license and criminal history." *United States v. Anguiano*, 795 F.3d 873, 876 (8th Cir. 2015) (citing *United States v. Barragan*, 379, F.3d 524, 528-29 (8th Cir. 2004).

Also relevant to the interaction in this matter is the established rule that "[f]ollowing a lawful 'custodial arrest,' a search of the arrestee's person incident to arrest 'requires no additional justification.'" *United States v. Brewer*, 624 F.3d 900, 905 (8th Cir. 2010) (quoting *United States v. Robinson*, 414 U.S. 218, 235 (1973)). Furthermore, "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Arizona v. Gant*, 556 U.S. 332, 343 (2009). *See also United States v. Davis*, 569 F.3d 813, 816-17 (8th Cir. 2009).

Furthermore, "[i]f an officer views contraband in plain sight through an automobile's window, he has probable cause to search that vehicle." *United States v. Dunn*, 928 F.2d 688, 693 (8th Cir. 2019), citing *United States v. Fladten*, 230 F.3d 1083, 1086 (8th Cir. 2000). "As long as the law enforcement officials have probable cause, they may search an automobile without a warrant under the automobile exception." *Fladten*, 230 F.3d at 1085.

In this case, Chief Stanfield approached a vehicle that was parked in a government housing parking space following a call from a concerned citizen who believed the occupant was passed out. Chief Stanfield's act of checking on the occupants in the Honda was not to investigate a crime rather a performance of his duty as a community caretaker. While not discussed by either party, Chief Stanfield needed to determine why a person was passed out in a vehicle after 8:30 in the morning in a government housing parking area. The governmental interest justifying Chief Stanfield's intrusion in this case was the need to determine if the driver was incapacitated and required emergency

assistance (*i.e.*, to help someone in danger), or whether the driver may have been intoxicated and at risk of driving the car in that condition upon waking (*i.e.*, to ensure the safety of the public), or if the occupants posed some other danger to public safety based on the unusual circumstances. These interests outweighed the right of the occupants who were sleeping in the Honda to be free from government intrusion.

Although Chief Stanfield was able to successfully rouse the occupants of the car, he needed to ensure their safety and that of the community. He asked routine questions such as what they were doing at that location. The woman, who was in the driver's seat, indicated she and the man in the front passenger seat were looking for a place to stay. That was strange considering the fact the pair were passed out in a parking space for government housing and not by a hotel or motel. When asked whether there were any guns or drugs in the car, the woman said "no" and the man replied, "there shouldn't be." The man's response suggested there could be either guns or drugs in the car. Guns could pose a danger to the community and the presence of drugs would represent criminal activity. Next, when asked for identification the pair responded that they had none. The woman indicated that her license was either revoked or suspended. This meant that if either of the occupants drove the Honda it would be a law violation. The man did not provide sufficient information to verify his identity. Additionally, Chief Stanfield believed the pair behaved more nervous and scared than warranted under the circumstances. Chief Stanfield asked the woman to sit on a concrete block situated toward the rear of the vehicle, at which time he noticed there was not a license plate on the rear of the Honda. He then radioed dispatch with the VIN and learned the Honda had

been reported stolen from the Nashville, Tennessee area.  With that news, Chief Stanfield moved to the passenger side of the car to secure the male passenger.  As he was placing Conley in handcuffs, the woman took off running.  Chief Stanfield placed Conley under arrest for possession of a stolen vehicle and patted him down.  A pill bottle containing heroin was recovered.  Chief Stanfield then observed a handgun in plain view on the passenger side floorboard of the Honda.  A check of the serial numbers on the gun resulted in Chief Stanfield learning the gun was stolen.

Based on an examination of the factors considered in *Harris*, the Court concludes that the scope of Chief Stanfield's encounter with the Honda occupants was carefully tailored to satisfy the purpose of the initial interaction.  His brief inquiry about why the occupants were asleep in a parking lot where they didn't belong, whether there were drugs or guns in the vehicle, and who they were led to the discovery that the Honda was stolen.  These routine questions were reasonable under the circumstances.  The fact the female driver fled from the scene on foot added to the information supporting further detention and investigation of Conley.  The events transpired within a short amount of time.  Chief Stanfield's actions and the length of the intrusion were reasonable under the circumstances.

The Court further finds that the pat-down of Conley was justified under *Terry*.  In addition, the discovery of the gun in the passenger floorboard was justified under the plain view and automobile exceptions to the warrant requirement.  Furthermore, the inventory search of the Honda was lawful.  *See Colorado v. Bertine*, 479 U.S. 367, 372 (1987).

Finally, as to Conley's claim that Chief Stanfield parked his patrol car in a manner that resulted in his unlawful detention is unfounded in that the Honda could have been driven out of the parking space without striking the patrol car.

Much like the inquiry in *Harris* regarding the specific and unusual facts presented therein, the analysis of the issues raised by Conley have been "guided by the Fourth Amendment's central requirement, reasonableness."  747 F.3d at 1019-20.  Chief Stanfield's response to the situation he faced the morning of June 25, 2020, was reasonable.

Alternatively, in the event Chief Stanfield's actions in evaluating whether the occupants of the Honda posed a danger to the community or themselves were not reasonable, mere passengers typically "do[] not have standing to challenge a vehicle search where he has 'neither a property nor a possessory interest in the automobile.'" *United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015) (quoting *Rakas v. Illinois*, 439 U.S. 128, 148 (1978).  As stated in *Byrd v. United States*, "a person present in a stolen automobile at the time of the search may [not] object to the lawfulness of the search of the automobile."  138 S.Ct. 1518, 1529 (2018) (citing *Rakas*, 439 U.S. at 141, n. 9)).  "No matter the degree of possession and control, the car thief would not have a reasonable expectation of privacy in a stolen car." *Id*.

Conley presented no evidence that he had consent or permission from the owner of the vehicle to take it from Tennessee to Missouri, and the vehicle had been reported stolen.  Thus, Conley does not have standing to contest the seizure of any items seized

from the Honda.  Furthermore, the search of his person was lawful as a search incident to Conley's lawful arrest for possession of a stolen vehicle.

In consideration of the foregoing, it is recommended that Conley's request for suppression of the physical evidence seized from his person and the Honda be denied.

**II.B.   Are Conley's statements admissible?**

The Defendant asserts that any statements he made were also the product of the unlawful seizure.  (Doc. 25 at p. 3.)

"[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'"  *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011), quoting *Segura v. United States*, 468 U.S. 796, 804 (1984).  "[T]he defendant bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence."  *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007).

In this case, because the initial seizure of Conley occurred by virtue of Chief Stanfield performing a community caretaking function, and the fact Conley was subsequently lawfully arrested based on his possession of a stolen vehicle, the officer did not violate Conley's constitutional rights and his statements were not fruit of the poisonous tree.  *See United States v. Goodale*, 738 F.3d 917, 922 (8th Cir. 2013).

To the degree that Conley claims his statements at the police station to Chief Stanfield on June 25, 2020 and to TFO Callen on June 26, 2020, were taken in violation of *Miranda v. Arizona*, 384 U.S. 436, 448-450 (1966), the evidence submitted directly

refutes such a claim. Both officers reviewed the *Miranda* warning with Conley, and Conley both acknowledged and waived those rights orally and in writing. *See* Government Exhibits #1 and #8 for Chief Stanfield and Government Exhibits #2 and #9 for TFO Callen. Conley did not present any evidence that his statements were involuntary so that issue is not considered.

The Court finds that the statements Conley made during his encounter with Chief Stanfield at the scene and at the police station, as well as his statements to TFO Callen should be admissible at trial.

### III.  Conclusion

**IT IS HEREBY RECOMMENDED** that the Defendant's Motion to Suppress Evidence and Statements (Docs. 25) be **DENIED**.

The parties are advised that they have fourteen days, or not later than December 6, 2021, to file written objections to the Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

_s/*Abbie Crites-Leoni*_____
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of November, 2021.